# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

101 West Lombard St., Baltimore, MD 21201

USDC- BALTIMORE
'25 APR 25 PM 1:41

Isaac Mulamba )

)

)

)

)

*Plaintiff.* )

)

)        **PLAINTIFF'S COMPLAINT**

v.    )     **JURY TRIAL DEMANDED**

)     Case No. ABA 25-CV-1334

)

The Board of Education of Baltimore County )

)

)

*Defendant.* )

)

)

)

)

)

HD

Rcv'd by: AR

## 1.    Introduction

1. COMES NOW Plaintiff Isaac Mulamba ("*Mulamba*", "*Plaintiff*", or "*him*"), as and for his Complaint against Defendant the Board of Education of Baltimore County ("*The Board*", "*BCPS*" or "*Defendant*") and hereby alleges as follows:

## 2.    Background

2. The original action was initiated in the Circuit Court for Baltimore County to redress Defendant's unlawful employment practices, which included workplace harassment, discrimination, retaliation, and wrongful termination ("constructive discharge") against Plaintiff based on his race, sex, and/or national origin. On September 29, 2023, the Circuit Court granted Defendant's motion to dismiss for failure to state a claim and dismissed Plaintiff's Title VII claims for failure to establish prima facie cases of discrimination at the pleading stage (C03CV23001611). The Appellate Court of Maryland affirmed the dismissal on December 13, 2024 (ACMREG16562023). Plaintiff subsequently filed a Petition for a Writ of Certiorari to the Appellate Court on February 6, 2025, and the petition is now pending before the Supreme Court of Maryland (SCMPET04742024).

3. Before this Court are federal claims that Plaintiff, then proceeding *pro se* and without legal assistance, did not raise in the Circuit Court proceedings. Plaintiff herein also alleges a claim for fraud, which is subject to a three-year statute of limitations, compelling the present filing.

4. Plaintiff does not seek duplicative recovery for the same injury and reserves the right to amend the requested relief based on the Supreme Court of Maryland's decision or this Court's. Plaintiff will also provide this Court with timely updates regarding the parallel proceedings as they become available and as necessary.

5. Critically, prevailing in either court would resolve the case in the other jurisdiction.

### 3.    Nature of the Claims

6. The administrative remedy process is not adversarial, and a party has duty to investigate the facts. *Cook v. Heckler*, 783 F.2d 1168, 1173–74 (4th Cir. 1986)(alterations in original). See also *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005)(Administrative exhaustion…is not a formal litigation proceeding.).

7. Under Maryland law, state agencies—including county school boards[1]—are legally mandated to investigate written complaints. EEO officers in state agencies act under color of state law within the scope of employment–they are required to *"meet* the complainant, *investigate* and *make* recommendations within 30 days"–it is the law (*infra at 41-42*). However, none of the stipulated steps happened for Plaintiff. The Baltimore County Board of Education's EEO officer—a licensed lawyer—took 180 days before meeting the complainant and additional 30 days to investigate and submit a dismissal recommendation (**Exhibit A**), directly violating statutory timelines and prejudicing Plaintiff. The Board's Policy 8420 expressly forbids adverse actions such as *"Termination of Employment"* for filing a legitimate complaint (*infra pp 43-44*). Delays or failure to investigate a complaint reflect an institution's deliberate indifference to its legal obligations and erode trust in workplace fairness. Courts emphasize

---

[1] "We [The Supreme Court of Maryland] have long considered county school boards to be State agencies rather than independent, local bodies." *Board of Education of Baltimore County v. Zimmer-Rubert*, 409 Md. 200, 973 A.2d 233 (2009)(alterations added). See also, e.g., *State v. Board of Education*, 346 Md. 633, 635 n. 1, 697 A.2d 1334, 1335 n. 1 (1997)("The various county boards of education are State agencies."); *Board v. Secretary of Personnel*, 317 Md. 34, 44 n. 5, 562 A.2d 700, 705 n. 5 (1989) ("It is settled that county boards of education are State agencies."); *Bd. of Educ. v. P.G. Co. Educators' Ass'n*, 309 Md. 85, 95 n. 3, 522 A.2d 931, 936 n. 3 (1987)("County boards of education are, of course, State agencies and not agencies of the county governments."); *Montgomery Co. Ed. Ass'n v. Bd. of Educ.*, 311 Md. 303, 317, 534 A.2d 980, 987 (1987) (recognizing the local boards as State agencies); *McCarthy v. Bd. of Education of A.A. Co.*, 280 Md. 634, 639-50, 374 A.2d 1135, 1138-43 (1977)(examining the history of Maryland public education from colonial times, through the Constitutions of 1864 and 1867 and the concomitant statutes, to conclude that the Board of Education of Anne Arundel County is a State agency).

that thorough and timely investigations are critical to upholding the civil rights and deterring misconduct. By enforcing accountability, courts promote proactive resolutions, safeguards equitable workplaces, and fulfills a collective social responsibility to protect employees and jobs. Compliance is therefore not merely procedural—it is a moral imperative.

### 4.    Parties

8.  Plaintiff was employed full-time by Defendant for approximately eleven (11) months and met the statutory definition of a public or "government" employee under federal law and the laws of the State of Maryland.

9.  Defendant is a public entity under the authority of the Baltimore County government.

### 5.    Jurisdiction and Venue

10. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper under 28 U.S.C. § 1391 because the conduct complained of occurred within the District of Maryland.

12. The amount in controversy exceeds the jurisdictional minimum of US$75,000.

13. At all times relevant to the factual allegations, Plaintiff was resident of Fairfax, Virginia and remains a citizen of the State of Pennsylvania, and Defendant is based in Towson, Maryland.

14. This Court also has jurisdiction on the basis of diversity of citizenship.

15. Accordingly, Defendant could have—and indeed should have—foreseen being sued in a federal court in the State of Maryland.

### 6.    Exhaustion of Administrative Remedies

16. Plaintiff exhausted his contractual and administrative remedies. The EEOC issued a Right to Sue from the EEOC. **Exhibit B.**

### 7.    Factual Allegations

*Background*

17. Mulamba is a Black male and a U.S. citizen of African descent. He earned a master's degree in public policy from the University of Massachusetts, building on earlier undergraduate and graduate studies in applied sciences. This academic foundation places him at the intersection of social issues and data modeling, enabling him to approach complex societal challenges with both analytical rigor and policy insight.

18. Following his public policy studies, he served for one year in the AmeriCorps VISTA program. His professional experience includes roles at several nonprofit organizations, such as the United Nations Development Programme (UNDP) in New York, the United Planning Organization (UPO) in DC—a Community Action Agency—and Homewood Children's Village, a nonprofit operating in three community schools in Pittsburgh, PA.

19. Through this experience Mulamba started developing expertise in special education, focusing on education inequities, even as federal mandates emphasized reducing race-based disparities in educational outcomes (NCLB Act (2001); ESSA (2015)). In 2021, Mulamba joined Fairfax County Public Schools (FCPS) as a Probationary Data Specialist/Part B Data Manager, where he worked in the Central Office to develop strategies and address race-based disproportionalities in student discipline, suspensions, disability identification, and other areas.

20. He was poised to transition into a full-time government role with FCPS within two years when an opportunity arose with Baltimore County Public Schools (BCPS) in Towson, MD.

21. The BCPS position offered immediate full-time employment with the Baltimore County government, a higher salary (16% from 76k to 91k) and pension benefits. He went through a rigorous four-stage panel interview process including Mr. McCall–Chief HR Director; Ms.

Conya Bailey–Department Director, the Executive Director and other department PhDs. The interview panel found Mulamba qualified for the position and extended a job offer. **Exhibit C**.

22. Before accepting the job offer, due to the 80-mile (one-way) commute from his home in Fairfax, VA, to Towson, MD, he negotiated a hybrid work arrangement with Mr. McCall and the hiring Executive Director. They agreed on three remote days and two in-office days per week, reducing his weekly commute from 800 miles to 320.

23. An office was also allocated by the executive director upon Mulamba's request due to his managerial role.

24. There was another vacant office on the same floor. There were other vacant offices on other floors. There were other vacant offices on other BCPS premises. Requesting an office was easy, yet Ms. Catherine Armstrong, a semi-retired and part-time white female administrative secretary to the executive director, asked Mulamba to share his office. Mulamba obliged more so because he only used his office twice per week.

25. Other requests were not granted, e.g., a new laptop or the ability to have administrative privileges to install software of choice on the government laptop.

26. HR agreed to the terms of employment to induce Mulamba to join BCPS *and facilitate a lateral transfer of knowledge from FCPS to BCPS* as discussed in the interviews. Other inducing promises were year salary raises and bonuses.

27. Mulamba discharged his duties in all respects and his performance was consistent with BCPS's legitimate business expectations: he automated data processes, introduced new technologies such as Power BI and Python-based data processing, implemented an excel spreadsheet to start tracking the State Performance Plan/Annual Performance Report (SPP/APR) Key Performance Indicators (KPIs), and interacted with all directors to help resolve their data problems.

28. There were no complaints but in fact, he received compliments from his new colleagues.

*Workplace Strife leads to Workplace Harassment*

29. Mulamba's role at BCPS as at FCPS required being sensitive and comfortable with issues of racial bias and education inequities–it came with the territory.

30. Mulamba experienced strife and resistance from colleagues starting in March 2022.

   - Colleagues started by threatening to revoke his database access when he started looking for data to make sense of some of the reports, namely the SPP/APR reports.

   - To the extent that he inquired from the team about how the Maryland State Department of Education(MSDE) acquired data from BCPS, nobody cooperated, nobody cared.

   - There was a meeting where everybody insisted that Mulamba ask for prepared data rather than raw data.

31. Mulamba complained to the executive director about the mistreatment and lack of cooperation.

32. The hiring executive director, who was his direct supervisor, resigned in June 2022.

33. Before exiting, the executive held a meeting with Mulamba, complimented him on his performance and encouraged him to continue working with the other directors.

34. Ms. Bailey became the department leader in the absence of an executive director. A new executive director, Ms. Myers, a white female, was appointed.

35. When Mulamba learned about the new executive director, he sent her a welcome email to which she responded in a rather unusual manner: "*I will set up a meeting to understand your responsibilities in this department.*"

*The First Job Transfer*

36. Mulamba found an accommodation near the workplace and paid a deposit because even though he had reach a work arrangement, driving 320 miles per week was still exhausting.

37. Mulamba cancelled the rental contract at the email of the department director Ms. Bailey, an African American female, who was the interim leader in the absence of an executive director.

38. BCPS enforced a new four-day in-office workplace policy. Ms. Bailey required Mulamba to return to the office 4 days per week.

39. Mulamba requested short-term reasonable accommodation to be given time to make new arrangement.

40. Ms. Bailey denied the request even though Mulamba's work could be fully done remotely.

41. On August 27, 2022, Ms. Bailey and Mulamba had a heated phone call about his absence from the office. Mulamba explained that he hadn't received any further email communication from Ms. Bailey, and he was working according to the terms he had negotiated upon hiring.

42. Mulamba responded that he had negotiated both his terms of employment and his employment privilege–an office space. Ms. Bailey stated that Mulamba should return to the office 4 days per week and communicated a cubicle number before abruptly ending the call.

### The Second and Third Job Transfers

43. In the same first meeting, as Mulamba was explaining his responsibilities, Ms. Myers interrupted: "*No, I have Dan Klinger for that*", meaning, Mulamba's duties which responded to the executive director's requests would be handled by Mr. Klinger. Ms. Bailey was present.

44. Throughout this first meeting, as Mulamba continued to speak, Ms. Myers grinned, shook her head, touched her hair as if to convey that Mulamba was too pretentious as to his role.

45. She had never met Mulamba prior to this first meeting.

46. Mr. Klinger was a white male analyst in another department. Mulamba was hired while Mr. Klinger was there. Mr. Klinger was not a government employee as Mulamba was and thus was not qualified to handle certain sensitive data. Data belonging to minors is sensitive data. Mr.

8

Mulamba had gone through background checks and was the Local Education Agency Data Manager to handle sensitive data.

47. In the same meeting, Ms. Myers reiterated, like Ms. Bailey, *that Mulamba must return to the office per employer guidelines, and he will be moved from his office to a cubicle.*

48. Mulamba respectfully let both directors know that he had negotiated his employment terms and requested the employment privilege.

49. There were further exchanges in email over the two issues and a new meeting set.

50. In the new meeting, Ms. Myers picked up her pen, smashed it on the desk and reiterated her demands that Mulamba come back to the office and move to the cubicle. Mulamba politely reaffirmed his position and also asked for a meeting with HR. Ms. Myers denied both requests.

51. Ms. Myers followed up with certified mails to Mulamba's physical address over weeks concerning the same issues.

52. The mailman banged on his apartment door to such an extent that Mulamba started hiding from the mailman. He felt like he was being prosecuted. He wrote to the executive director to '*cease and desist*', and she stopped.

*Denial of reasonable accommodation was harassment*

53. Both directors had the prerogative to grant reasonable accommodation or at least renegotiate a new work arrangement on behalf of BCPS but chose not to.

54. Ms. Bailey had once required Mulamba to attend a meeting in person while everyone else attended remotely, which imposed on him a 160-mile return trip.

55. Ms. Bailey, on another occasion, required Mulamba to attend a meeting in person with her when she knew she wouldn't be present, which imposed on him another 160-mile return trip.

56. The three, Ms. Myers, Ms. Bailey, and Mulamba, were in their forties.

57. Neither Ms. Bailey nor Ms. Myers had tasks in the office that required Mulamba's onsite presence. Ms. Myers was new in her job, didn't have tasks that required Mulamba's presence other than enforcing the new workplace policy.

58. Ms. Bailey went to Farmers market during work hours. There was no problem.

59. Ms. Myers enjoyed reasonable accommodation as an executive and came in often on a normal workday around 11 am. Yet when Mulamba asked to even get to work late due to the traffic on the highway from Virginia to Maryland, she denied the request.

60. The directors made Mulamba's work life miserable by imposing driving an 80-mile route that presented numerous difficulties and significant challenges, including physical exhaustion.

61. Mulamba was aggrieved by the work environment that breached his employment terms, imposing excessive commute and reducing his corporate prestige and status.

62. Mulamba reached out via mail and email to the offices of law, the superintendent, HR, and other directors for intervention. There was no response.

*Workplace Harassment continues*

63. Mulamba decided to go to the office and meet with both directors to have a conversation and find a compromise. On 08/29/2022, he arrived early and sat in his office which was full of his belongings, and started attending to his work.

64. Around 10:00 am, Ms. Catherine Armstrong, the executive director arrived and conversed with Mulamba before going away. After a while, she returned with three other females: Ms. Claudine Daniel, an African American female secretary, Ms. Bailey and Ms. Myers.

65. They confronted Mulamba in his office space, while screaming at him "*to get out*" of his office, move to a cubicle and let another "department" occupy it.

66. The other department turned out to be Ms. Armstrong, the part-time, semi-retired, administrative assistant to Ms. Myers who remained in the same department.

67. People were emerging from their offices to witness the scene.

68. Mulamba sat quietly, and said: "I won't move out", while he was being humiliated and portrayed as the bad actor by females.

69. Mulamba had requested reasonable accommodation to potentially obviate space issues. There wasn't enough space for everyone to comfortably return to the office and there weren't even enough lavatories. The directors were attempting to enforce compliance with a workplace policy for the sake of enforcement and compliance without understanding the ramifications.

70. Everybody in the department, including a female accountant, retained their offices, only Mulamba was required to relinquish his office.

71. The office provided professional prestige, was symbol of corporate status, and reduced distractions, allowing him to focus and work with increased autonomy, such as controlling lighting and temperature. It also offered privacy for prayer. Additionally, due to his height (6'3"), Mulamba avoided health problems due to ergonomic issues.

*Intent to file a Complaint*

72. On the same day 08/29/2022, Mulamba emailed the female colleagues about his intent to file an internal EEO complaint due to the screaming and confrontational incident.

73. Ms. Myers responded by scheduling a meeting for 09/06/2022.

74. Mulamba, though, unhappy, started moving his belongings from his office to the cubicle.

75. The next day when he arrived onsite, his remaining belongings had been forcefully removed from his office and shoved into the cubicle in his absence, which left him traumatized, he felt as though he had been evicted.

11

*Filing of EEO complaint*

76. On 09/02/2022, Mulamba filed an internal EEO complaint, alleging discrimination based on race, sex or national origin and sought resolution to the material issues of reasonable accommodation and the office space. He named Ms. Myers as the main instigator.

*Retaliation*

*Female colleague makes racially charged comment*

77. On 09/06/2022, while waiting for the meeting with Ms. Myers, Mulamba heard Ms. Daniel say of him: *"This African guy wants an office. Would he have had an office in Africa?"*

78. Ms. Daniel had previously met Mulamba on another occasions and told him that he must move from his office. So, this made it the third encounter with Ms. Daniel.

79. Mulamba heard yet another female employee, say on the phone: *"Just come in a set your coat on the chair and go back home, it's not like anybody cares when you do come in..."*

80. Mulamba did a quick inspection and found that most cubicles were empty.

*Threat of performance evaluation*

81. In the 4 pm meeting on 09/06/2022, Ms. Myers threatened a performance evaluation when she said: *"I'll do your performance evaluation"* in response to Mulamba's intent to file an EEO complaint the previous week. Ms. Bailey was present.

82. Mulamba responded that he had filed the EEO complaint last Friday.

*Scheduling of Disciplinary meeting*

83. Nothing happened between 09/06 and 09/11. Mulamba continued working with Ms. Bailey, requested more time-off and was approved by Ms. Daniel.

84. Mulamba was off on 09/12/2022 per the time off approved.

85. On 09/12/2022, Ms. Myers sent an email to Mulamba, scheduling a disciplinary meeting for insubordination and asked that he bring [union] representation. She enjoined the attendance of Senior Executive Director Dr. Holmes, who accepted and insisted that Mulamba be present.

86. Mulamba responded that he would be unable to attend and requested that the meeting be rescheduled to 3 months ahead in December 2022 till he found representation.

*Multiple retaliatory employment acts by the executive director*

87. Having lost the opportunity to discipline, Ms. Myers took multiple employment actions:

   a. Ms. Myers denied his time-off requests, which were forwarded to her by Ms. Daniel.

   b. Ms. Myers required Mulamba to be onsite daily, amounting to one day more than the new four-day-in-office BCPS policy. In other words, Mulamba would have to endure an 800-mile weekly commute rather than the 640 miles which already breached his employment terms.

   c. Ms. Myers excluded Mulamba from the monthly departmental meetings.

   d. Ms. Myers ceased communication altogether.

*Fourth Job Transfer*

   e. Dr. Miller, a non-executive white male in the department, reached out to Mulamba on behalf of the executive director, discussed a project and conveyed that henceforth Mulamba would be reporting to him (Dr. Miller) rather than Ms. Myers.

   f. Dr. Miller never followed up on the project they had both discussed.

*Other retaliatory Actions*

   g. Ms. Myers transferred Mulamba's tasks to Mr. Klinger: Mulamba observed that Mr. Klinger had access to certain server spaces and responded to ad hoc requests previously under Mulamba's purview.

13

h.  Ms. Bailey undermined Mulamba by asking him to coordinate with Mr. Klinger on an ad hoc request when it should have been the other way around since Mulamba was the Data Manager and Mr. Klinger was just an analyst.

i.  Ms. Bailey continued undermining Mulamba by prioritizing other analysts' opinions over his when he was the Data Manager–not them. In one session, she shouted at him, e.g., when he didn't want to export data from a system and "transform it" or as it were, tamper with it before forwarding it to an external stakeholder.

j.  Ms. Bailey deliberately treated Mulamba differently, likely to placate the new executive director. Eventually, she also stopped communicating till his resignation.

k.  All directors shunned Mulamba and never responded to his emails.

l.  Mulamba's professional profile was removed from the Department of special education website.

### Inaction by the EEO office

88.  The EEO officer, Mr. Steward Beckham, is African American and a lawyer with a JD.

89.  Mulamba called the EEO office several times before and after his resignation, and had difficulties reaching them.

90.  When he finally reached the EEO office, the EEO officer seemed annoyed that he was calling to follow up on the EEO complaint.

91.  The EEO officer confirmed that he was going to investigate.

### Resignation

92.  Mulamba mailed and emailed requests for reasonable accommodation and sought intervention to address issues by HR.

93. HR never responded to Mulamba's mail request for intervention. The superintendent's office never responded. The Office of Law never responded.

94. Concerned by the impact on his mental health, Mulamba sought help from a therapist.

95. Mulamba started falling sick and visited doctors to secure and justify the need for reasonable accommodation due to the distance he was enduring.

96. The work conditions became unbearable as Mulamba had to drive 800 miles weekly: he faced a choice between his job and continue putting his health or life at risk.

97. Mulamba submitted his resignation form (**Exhibit D**), giving a two-week notice with the reasons for his intent to resign. HR never responded. He resigned on 11/11/2022.

*Negative reference/endorsement*

98. In December 2022, Mulamba went through a four-stage rounds of interviews and a technical assessment with another school district, Baltimore City Public Schools.

99. As part of the process, Mulamba made a Data Analytics presentation to a panel.

100. The panel interviewers were excited. They told him they were looking to "move fast", and would be in touch pretty soon.

101. The next step was a reference check.

102. Three months later, he followed up, they were no longer interested. They told Mulamba that they had cancelled the position.

103. They readvertised the position and never even let Mulamba know that he could reapply.

104. Alerted by a prospective employer, Mulamba called BCPS HR, introduced himself and asked: "*Am I available for rehire?*" HR never confirmed whether he was up for rehire.

105. BCPS has been refusing to answer questions from prospective employers to confirm Mulamba's work performance record.

106. Mulamba's employment with BCPS represented the highest salary on his resume. Due to BCPS HR being unable to confirm his employment conditions, terms and salaries and benefits, he's struggled to find anything close to the salary he enjoyed at BCPS.

107. Mulamba would have been earning an annual salary of $110,000 in 2025 if he were still employed by Defendant.

*Retaliation by the EEO office*

108. Before or around February 10, 2023, Mulamba received two certified mails from the EEO office urging him to drop the complaint after resignation.

109. Mulamba insisted that *the case should not be closed* (**Exhibit E**). The EEO officer agreed to investigate the complaint only after Mulamba threatened legal action if his EEO complaint allegations were not investigated, and insisted on an EEO interview.

110. The EEO officer never responded to Mulamba's assertions in email including that: "*I was forced to resign. You are well aware of the situation....*"

111. Mulamba reached out to the EEO officer and Chief HR officer before the EEO interview to seek ways to resolve his employment issues, they still ignored him and never responded.

112. The EEO officer denied a reasonable accommodation request to reschedule the EEO interview meeting when an inconvenience arose on the part of Mulamba.

113. The EEO officer stated that if Mulamba couldn't make it to the scheduled interview, he would reach a decision based on the information in his possession.

114. The EEO interview finally happened six months after the complaint's filing date.

115. To be sure, the interview happened at 3 pm on February 28, 2023, which Mulamba found out later to have been the eve of the deadline to file a charge with the MCCR (Maryland Commission for Civil Rights).

116. The EEO officer was rude and condescending in the interview and even asked who was in Mulamba's home. Mulamba said it was his wife. He then acted in a sabotaging manner, asking questions in a low voice, wasn't clear enough, looked away, feigned writing down or being busy…just as he sounded in the phone calls.

117. The EEO officer asked whether Mulamba was recording a video and said: "*no Maryland court would accept a video recording of the interview as proof of his behavior*" as proof of anything.

118. The EEO officer never brought all parties including Mulamba, the directors and coworkers together to attempt to hear each side and facilitate a resolution.

119. The EEO officer ultimately dismissed the complaint on March 31, 2023, as unsubstantiated seven months after the filing date of September 02, 2022.

120. The dismissal letter was sent via normal mail–not via certified mail.

121. The EEO complaint allegations couldn't have been unsubstantiated as found by the EEO officer. The complaint didn't list only employment discrimination as an issue, it sought resolution to the material issues of the office space and reasonable accommodation so Mulamba could continue his employment under negotiated or revisited employment terms.

122. Mulamba felt like he had been deprived of his rights but didn't know which ones.

123. Mulamba's suspicion grew stronger after realizing that BCPS doesn't publicize information about workplace policies regarding internal investigations or timelines interna. Mulamba was ever told about any grievance procedure during onboarding or where to locate such policies and any policies found by him did not contain any specifics about timelines.

*Defendant's deliberate indifference to legal compliance.*

124. Mulamba sought to understand why HR had completely ignored him, or why no department including the Office of the Superintendent never answered his requests for intervention with

the executive director who was engaging what he considered to be adverse employment actions towards him for filing an EEO complaint.

125. Mulamba was aggrieved that the EEO office took so long to investigate his EEO complaint.

126. Mulamba submitted an MPIA request to BCPS Office of Media and Inquiries. **Exhibit F.**

127. The BCPS Office of Media and Inquiries never responded to the MPIA request. This amounted to a breach of MPIA laws (*infra at 45*).

128. Mulamba retains email evidence showing that the point person in that office had read his email-based MPIA request more than 50 times but never responded.

129. On the other hand, Mulamba submitted another MPIA request during the same period to Baltimore City Public Schools and received a response within the stipulated 10-day timeline after being read a mere 10 times. **Exhibit G.**

## 8.    Causes of Action

### Count I
### 42 U.S.C. § 1983–Procedural Due Process
### Violation of Md. Const. Decl. of Rights, Art. 24 Procedural Due Process

130. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

131. Plaintiff, a Black man of African descent and a U.S. Citizen is a member of a protected class under the Fourteenth Amendment and 42 U.S.C. § 1981 and Title VII.

132. Plaintiff was qualified for his position as Data Analyst/Part B Data Manager, performed his duties competently and had no documented performance deficiencies.

133. As a full-time government employee of the Board, Plaintiff possessed a constitutionally protected property interest in his continued employment under the Due Process Clause of the Fourteenth Amendment.

134. Procedural due process under the Fourteenth Amendment safeguards individuals from governmental deprivation of property interests, including:

18

- Continued public employment where state law or policy creates a legitimate expectation of retention (*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)).

- Protection against the retaliatory harassment and constructive discharge for engaging in protected activity (e.g., filing an EEO complaint).

135. Plaintiff held his position for 11 months under Defendant's Policy 8420, which explicitly prohibits termination for protected activity, thereby creating a reasonable expectation of continued employment absent just cause.

136. The Board's Policy 8420 states that:

*"The Board prohibits termination of employment"* in retaliation for engaging in protected activity, including filing a legitimate complaint.

137. Workplace Policy 8420 alongside Maryland law and the federal civil rights protections, codified Plaintiff's property interest in his job.

138. Beckham, in his official capacity as EEO Officer, was legally required under [e.g., Md. Code Ann., State Gov't § 20-606] to:

- Investigate Plaintiff's EEO complaint within 30 days;

- Issue a written recommendation within the statutory timeframe.

139. Beckham, a lawyer, intentionally violated this duty, delaying the investigation for 210 days— a 7-month delay designed to be:

- Punitive: Designed to retaliate against Plaintiff for filing the complaint; and

- Prejudicial: Rendered any belated investigation procedurally and substantively meaningless.

140. Beckham was deliberately indifferent so as to:

- Force Plaintiff's resignation;

- Circumvent due process by denying him a timely remedy;

- Chill future protected activity by sending a message of institutional retaliation.

See *Bleich v. Florence Crittenton Servs. of Baltimore, Inc.*, 98 Md. S. Ct. App. 123, 142 (1993)(In a wrongful discharge action, temporal proximity between protected activity and discharge is evidence supporting an inference that the protected activity was the proximate cause of termination); *Staub v. Proctor Hosp*, 562 U.S. 411 (2011)(Scalia, J., concurring)(If a supervisor performs an act[s] motivated by discriminatory animus intended to cause [the] adverse employment action[s], and if that act[s] is a proximate cause of the ultimate employment action, the employer is liable); and see *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 801 (S.D.N.Y. 2020)("Termination…is obviously an adverse employment action.")

141. Defendant denied Plaintiff fundamental due process by:

- Pre-Deprivation Violations:
  - o Failing to provide notice of the grounds for a failure to investigate;
  - o Denying a pre-termination hearing (required under *Loudermill*).

- Post-Deprivation Violations:
  - o Refusing a meaningful opportunity to challenge his termination;
  - o Withholding access to the interactive process to challenge his termination.

142. These omissions were not negligent but intentional and willful, as Defendant:

- Knew of their obligations under their own Workplace Policy 8420 and Maryland law;

- Willfully ignored them to expedite Plaintiff's removal from his employment.

143. The handling of the MPIA request shows that Defendant was deliberately indifferent to Plaintiff's rights and legal compliance including:

a. Violation of Due Process (14th Amendment): Defendant's failure to respond to a lawful MPIA request, despite clear statutory obligations under Maryland law, deprived Plaintiff

20

of his right to access public records without due process, effectively denying a government transparency mechanism guaranteed by state law.

b. First Amendment Violation – Right to Petition & Access to Information: Defendant's refusal to acknowledge or comply with the MPIA request unlawfully obstructed Plaintiff's right to petition the government for redress and access public information, constituting an infringement on First Amendment-protected activity.

c. Arbitrary and Capricious Government Conduct (Substantive Due Process): Defendant's willful disregard of MPIA laws—including the failure to respond within statutory deadlines or provide a written explanation for delays—demonstrates a pattern of arbitrary conduct that shocks the conscience and violates Plaintiff's right to fair treatment under the law.

144. As a direct and proximate result of Defendant' actions, Plaintiff suffered:

- Wrongful termination (constructive discharge);
- Lost wages, benefits, and career opportunities;
- Severe emotional distress;
- Irreparable reputational harm.

145. As a direct and proximate result of this conspiracy, Plaintiff suffered economic damages (lost wages, benefits), emotional distress, reputational harm, and the loss of his employment.

146. Defendant's conduct was willful, malicious, and in reckless disregard of federally protected rights, entitling Plaintiff to compensatory damages, punitive damages, and attorneys' fees under § 1985(3).

147. Plaintiff is entitled to:

- Compensatory damages (back pay, front pay, emotional distress); punitive damages (due to Defendant' willful misconduct); declaratory relief; and attorneys' fees and costs under 42 U.S.C. § 1988.

## Count II
### Intentional Misrepresentation (or Fraud) under Maryland Law

148. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

149. Plaintiff-Employee had a relationship with Defendant-Employer, sufficiently close to support a cause of action for intentional misrepresentation. See *Virginia Dare Stores, Inc. v. Schuman*, (1938) quoted in *The Perimeters of Liability for Negligent Misrepresentation in Maryland*, Andrew C. McCandless Kidd, 48 MD. L. REV. 384 (1989)

150. A plaintiff must show the "breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." See *Environmental Trust v. Gaynor*, 370 Md. 89, 803 A.2d 512 (Md. 2002) at 97.

151. Defendant breached a legal duty by failing to meet complainant, investigate and make a recommendation within 30 days.

152. Under Maryland law, negligence "is any [conduct]...which falls below the standard established by law for protection of others against unreasonable risk of harm." See *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007).

153. To rise to the level of gross negligence, there must be "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." *Id.*

22

154. Plaintiff was required to exhaust all remedies. See *Gazunis v. Foster*, 400 Md. 541, 929 A.2d 531 (Md. 2007) at 565 (A plaintiff must exhaust all contractual and administrative remedies before seeking relief through the courts).

155. Abiding by the above logic, Plaintiff contacted most of Defendant's offices including the EEO office, followed up, and waited for the conclusion of the internal investigation.

156. However, the EEO office seized upon that legal obligation, and capitalized on his ignorance to deliberately impede the process.

157. Beckham intentionally made false representations to Plaintiff knowing that he would rely on the false representations.

158. The false representations Beckham made to Plaintiff were that he was investigating the complaint when Plaintiff called his office and he would investigate during the EEO interview.

159. Defendant' representations were in fact false when they were made.

160. Defendant had no intention of performing these promises at the times they were made and have not performed as promised.

161. Knowing he would not be able to fulfill the representations and their falsity, Beckham made these representations recklessly and without regard for their truth, and/or with no reasonable grounds for believing them to be true.

162. At the time Beckham asserted during the EEO interview that he would investigate the EEO complaint, the time to investigate and make a recommendation had already been exceeded so that even if he indeed investigated, he ipso facto didn't because he was way beyond the deadline to claim the merits of any investigation.

163. Beckham induced Plaintiff to believe that he would investigate when he knew well that he couldn't investigate past the deadline.

164. When Beckham made the false representations to Plaintiff, he did so with the intent to secure Plaintiff's reliance—thereby ensuring Plaintiff's wrongful termination was sealed and preventing any investigation into the allegations of harassment and retaliation by the executive director.

165. Beckham issued false statements in writing that the EEO office investigated the complaint allegations. The EEO officer committed a crime. *MD State Govt Code § 9.5-312 (2013)(3)*: "*make or use a false writing or document knowing the writing or document contains a false, fictitious, or fraudulent statement*".

166. The EEO office's reckless indifference was evident when they set up a pretend EEO interview in February 2023, looked Plaintiff in the face for almost an hour, and pretended to be conducting an EEO interview to address issues that affected his property interests in his employment. They knew that everything was a façade. By law, the interview should have happened in September 2022.

167. Defendant do not care about laws. Had Plaintiff agreed to drop the complaint, Defendant would still have been legally non-compliant.

168. At all relevant times, Plaintiff was ignorant of the falsity of Beckham's representations and promises, and believed them to be true.

169. In reliance on Beckham's representations and promises, Plaintiff was induced to wait seven months for an investigation outcome even as Beckham carefully planned and obstructed compliance with the state administrative remedy.

170. Had Plaintiff known about the law and intentions of Beckham, he would not have waited, he would have stopped Beckham and insisted on an outcome in the same manner he insisted on

the EEO interview. Plaintiff reasonably relied on Beckham's misrepresentations and false promises, and Plaintiff's reliance was justified.

171. Beckham concealed material facts to Plaintiff's decision to wait for the investigation outcome. Defendant intended to deceive Plaintiff by concealing these facts and Plaintiff did not know about these concealed facts.

172. The EEO officer lied that he was investigating beyond 30 days; that he was meeting Mulamba for the EEO interview six months after the deadline for any interview, and ultimately lied that he had investigated and concluded between the sixth and seventh months.

173. The EEO officer was a trained professional and a licensed attorney: false statements, actions or omissions by a legal expert with 'superior knowledge' are actionable as misrepresentations.

174. The EEO officer strategically stalled the investigation for six months and then set up and attended an EEO interview for close to one hour, knowing that he was misrepresenting and sabotaging the whole process.. He counted on Plaintiff's ignorance. The whole interview was a sham, a façade of compliance and due process to seal Plaintiff's termination.

175. Furthermore, he set up the EEO interview on the eve of the deadline to file a charge with the MCCR, to obstruct compliance with the state administrative remedy.

176. Plaintiff as a public employee didn't know he was being lied to. Plaintiff had no choice but to trust and rely on the EEO officer. His reliance was justifiable as the EEO officer is the designated person to handle complaints and related processes.

177. As an employee like the 21,000 employees who work for Defendant, Plaintiff had the right to rely on the EEO officer's assertions, actions and omissions on matters related to grievance procedures.

178. If Plaintiff had known that the EEO officer was lying or misrepresenting the process, he would have called him out and insisted on a proper procedure as he had insisted and made the EEO interview happen.

179. Had Beckham complied with the law and fulfilled his duties—or had Defendant not concealed proper investigative procedures and timelines from its employees—Plaintiff would not have resigned. There would have been a resolution to the material issues of the EEO complaint, including the employment privilege (office space) and the breach of his employment terms (such as the denial of reasonable accommodation and the failure to renegotiate terms…).

180. Beckham had a duty, individually, as a professional lawyer and in his official capacity as EEO officer of the Board to disclose concealed facts to Plaintiff because they:

   a) affirmatively represented the opposite to Plaintiff;

   b) disclosed some facts to Plaintiff but intentionally failed to disclose other facts thereby making the disclosure deceptive;

   c) intentionally failed to disclose facts to Plaintiff that were known only to Beckham as EEO officer and lawyer, and that Plaintiff could not have discovered;

   d) Beckham prevented Plaintiff from discovering facts; and/or by virtue of an EEO officer being in a fiduciary relationship with Plaintiff.

   e) Defendant' omission of such information, had it been disclosed, would have caused Plaintiff not to wait for the investigation outcome for seven months but insist on his outcome sooner to protect his employment.

181. Plaintiff has been harmed by his reasonable reliance, including that Defendant failed to provide Plaintiff with a remedy to protect his employment.

182. Defendant failed to abide by their promise and/or representation in Policy 8420 to protect employees from retaliation.

183. As a proximate result of Defendant' fraudulent conduct, Plaintiff has suffered and continues to suffer economic harm, including monetary, fees, and interest, in a sum according to proof.

184. As a proximate result of Defendant' fraudulent conduct, Plaintiff has suffered and continues to suffer emotional distress and mental pain and anguish, all to his damage in a sum according to proof.

185. Defendant' conduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, entitling Plaintiff to punitive damages against Defendant.

### Count III
### Declaratory Judgment, *Rule 57, Fed. R. Civ. P., and 28 U.S.C. § 2201.*

186. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

187. Defendant The Board maintains an express policy prohibiting termination or retaliation against employees for engaging in protected activity, including the filing of legitimate discrimination complaints. This policy is codified in Policy 8420, and violations constitute a breach of contract and/or state law.

188. Plaintiff exercised his protected rights by filing a formal EEO complaint alleging discrimination and harassment against the Executive Director, his direct supervisor. This complaint was submitted in accordance with Board procedures and applicable law.

189. The EEO Officer of the Board, acting under color of state law and within the scope of employment, engaged in unlawful retaliation by:

- Failing to conduct a timely or meaningful investigation into Plaintiff's complaint, in violation of [Maryland state law, e.g., Md. Code Ann., State Gov't § 20-606 or Ann. Code Md., State Pers. & Pens. Art., §§ 2-302, 4-106, 6-102, 11-104, 11-105];

- Breaching the Board's own policies guaranteeing a fair and prompt investigative process;

- Constructively discharging Plaintiff's resignation through deliberate inaction, thereby depriving him of his right to a remedy.

190. Defendant may assert the spurious defense that they eventually investigated or made a recommendation. However:

- Any investigative actions taken after the 30-day statutory deadline were untimely and legally ineffective;

- A belated or post-hoc "investigation" does not cure the initial violation or the harm caused by the delay;

- Defendant' failure to act within the required timeframe constituted a *de facto* refusal to investigate; *ipso facto*, rendering any subsequent recommendations procedurally and substantively invalid.

191. There is no genuine controversy regarding whether Plaintiff's EEO complaint was timely and properly investigated. The record conclusively demonstrates that:

- Defendant did not comply with the mandated timeline;

- Their inaction prejudiced Plaintiff's rights and constituted retaliation.

192. Plaintiff had a clear legal right to:

- A timely investigation of his complaint under Maryland law;

- A written recommendation within the statutory/regulatory period;

- Freedom from retaliation for protected activity under Title VII and Maryland law.

193. Defendant' failure to adhere to these requirements was a per se violation of his rights.

194. Plaintiff is entitled to a declaratory judgment establishing:

- He could only be terminated for cause, not in retaliation for filing an EEO complaint;

- The EEO Officer, acting on behalf of the Board, breached its legal duty by failing to investigate and issue a recommendation within the required timeframe;

- This failure directly caused Plaintiff's constructive discharge, entitling him to remedies.

195. A judicial declaration is necessary and appropriate under [Md. Code Ann., Cts. & Jud. Proc. § 3-406 or analogous statute] to:

- Conclusively adjudicate Plaintiff's rights;

- Clarify Defendant' legal obligations; and

- Prevent future harm to similarly situated employees.

### Count IV
### Conspiracy to Deprive Rights in violation of 42 U.S.C. § 1985(3)

196. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

197. Defendant BCPS, via Beckham and McCall, conspired to deprive Plaintiff of his federally protected civil rights, in violation of 42 U.S.C. § 1985(3).

198. The conspiracy included other actors involved in employment decisions—both before and after Plaintiff filed his EEO complaint—who willfully coordinated to undermine Plaintiff's rights by not responding to any of his complaints. These actors included the EEO officer, HR and other departments, and others who knowingly participated in, facilitated, or condoned the unlawful conduct.

- Before resignation:

  ➢ The EEO officer refused to investigate his EEO complaint;

  ➢ HR led by McCall ignored mails and emails requesting reasonable accommodation;

  ➢ HR ignored his resignation letter which complained about workplace issues;

29

➢ The Office of Law ignored his request for intervention with by the executive director;

➢ The Office of the Superintendent ignored his contact via email for intervention with the executive director.

- After resignation:

  ➢ The EEO officer pressured Plaintiff to drop the complaint;

  ➢ The EEO officer sabotaged the EEO interview;

  ➢ The Chief HR Officer and the EEO officer ignored Plaintiff's request for a meeting to resolve issues;

  ➢ The Office of media and inquiries ignored Plaintiff's MPIA request;

  ➢ HR refused to provide reference or confirm employment records.

199. The conspiracy was motivated by retaliatory animus, evidenced by Defendant' statements, conduct, and differential treatment.

200. Their agreement was manifested through a pattern of coordinated conduct designed to retaliate against and force Plaintiff's resignation following his protected opposition to discrimination.

201. In furtherance of the conspiracy, Defendant committed multiple overt acts, including but not limited to:

- Retaliatory employment actions (e.g., unjustified disciplinary measures, exclusion from meetings, reassignment of duties, reassignment of supervisor, ceasing communication);

- Creating a retaliatory hostile work environment to pressure Plaintiff into resigning;

- Deliberately disregarding or sabotaging Plaintiff's EEO complaint process;

- Spreading false or defamatory statements to damage Plaintiff's professional standing.

202. *Beckham and McCall especially were key central figures in the conspiracy.* They had a mutual understanding that the Executive Director engaged the Board of Education of Baltimore County directly with her adverse employment actions against Plaintiff. As a result, the EEO officer and the Chief HR officer conspired to ignore all mail and email from Plaintiff, demonstrating a meeting of the minds to achieve the unlawful objective of frustrating Plaintiff into leaving his employment.

203. The conspiracy interfered with Plaintiff's rights as a public employee of [the Baltimore County Government], including:

- Right to be free from employment discrimination (Title VII of Civ Rgts Act of 1964);
- Right to petition for redress of grievances (1st Amendment via EEO complaint);
- Right to equal protection under the law (14th Amendment).

204. The conspiracy was directly motivated by Plaintiff's protected activity—namely, his filing of an EEO complaint—which Defendant sought to punish through systematic retaliation and constructive discharge efforts. Their actions were part of a coordinated campaign to suppress Plaintiff's rights.

205. As a direct and proximate result of this conspiracy, Plaintiff suffered economic damages (lost wages, benefits), emotional distress, reputational harm, and the loss of his employment.

206. Defendant' conduct was willful, malicious, and in reckless disregard of federally protected rights, entitling Plaintiff to compensatory damages, punitive damages, and attorneys' fees under § 1985(3).

### Count V
### Aiding and Abetting Discrimination under Maryland law

207. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

31

208. Under Title VII of the Civil Rights Act of 1964 and Maryland law, an individual may be held liable for aiding and abetting unlawful discrimination when they knowingly facilitate, condone, or fail to take corrective action in response to prohibited conduct.

209. The EEO officer had a duty to promptly and thoroughly investigate the complainant's allegations of discrimination by the executive director and to provide an appropriate remedy.

210. Instead, the EEO officer's deliberate inaction and failure to address the complaint effectively constituted participation in the executive director's discriminatory conduct.

211. By failing to timely investigate the complainant's EEO complaint of discrimination and refusing to provide an effective remedy, the EEO officer engaged in retaliation under an aiding and abetting theory.

212. The officer's inaction perpetuated the harm caused by the executive director—the primary actor in the discrimination—by allowing the hostile environment to continue unchecked.

213. This failure to act by the EEO officer was not merely negligent but demonstrated a conscious disregard for the complainant's rights, enabling the executive director's misconduct.

214. Under Maryland law, an employer's agent (such as an EEO officer) may be held liable for breaches within the scope of employment and specifically aiding and abetting if their conduct "substantially assists" in the violation. Here, the officer's refusal to investigate or intervene provided implicit approval of the executive director's actions, thereby encouraging further retaliation.

215. Consequently, the officer's conduct meets the criteria for aiding and abetting liability, and the complainant is entitled to relief.

### Count VI
### Violation of Liberty Interest  (14th Amendment Due Process)

216. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

32

217. Plaintiff, a former employee of the Board of Education of Baltimore County, possessed a constitutionally protected liberty interest in his reputation and future employment opportunities under the Fourteenth Amendment's Due Process Clause.

218. After filing an EEO complaint, Plaintiff faced retaliation, intolerable working conditions, and constructive discharge, forcing his resignation.

219. Following his resignation, Plaintiff sought new employment, including with the Board of Education of Baltimore City, where he:

- Successfully completed a four-step interview process;

- Performed a data analytics task and presentation, impressing the panel;

- Was assured of a fast hiring decision but was never contacted again;

- Later he inquired and was told the position had been cancelled;

- He later discovered that the position was readvertised without explanation, suggesting blacklisting.

220. Prospective employers contacted the Board of Education of Baltimore County's HR to verify Plaintiff's employment record, but HR:

- Refused to provide any meaningful information about his employment;

- Remained silent as to his stellar performance history;

- Effectively stigmatized him by omission, implying misconduct or poor performance.

221. This silence and refusal to provide a reference:

- Deprived Plaintiff of a meaningful opportunity to clear his name;

- Damaged his professional reputation in violation of his right to occupational liberty (*see Bd. of Regents v. Roth*, 408 U.S. 564 (1972));

- Constructively barred him from future employment, as employers interpreted HR's silence as a negative endorsement or reference.

222. The Board's actions constituted state-imposed stigma plus deprivation (see *Paul v. Davis*, 424 U.S. 693 (1976)), because:

- They knowingly and falsely implied wrongdoing by refusing to confirm his good record;

- This directly harmed his ability to secure employment, especially with other public school employers;

- No name-clearing hearing or due process was provided to remedy the harm.

223. As a direct and proximate result, Plaintiff suffered:

- Loss of employment opportunities;
- Permanent reputational harm;
- Emotional distress and financial damages.

224. Defendant' conduct was intentional, reckless, and in violation of clearly established constitutional rights.

### Count VII
### First Amendment Retaliation under 42 U.S.C 1983

225. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

226. The First Amendment protects public employees from retaliation for engaging in speech on matters of public concern, including complaints about workplace discrimination and violations of employment rights. (See *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983)).

227. Plaintiff engaged in protected speech by filing an internal EEO complaint and advocating for his rights regarding workplace discrimination, harassment, and reasonable accommodation.

228. Defendant, through its agents and employees, retaliated against Plaintiff for exercising his First Amendment rights by subjecting him to adverse employment actions, creating a hostile work environment, and ultimately forcing his constructive discharge.

229. The executive director retaliated against Plaintiff for his protected speech through the following adverse actions:

- Announcing the prospect of 'negative' performance evaluations if complaint is filed.

- Unjustified disciplinary measures: Scheduling a disciplinary meeting for "insubordination" after Plaintiff filed his EEO complaint.

- Subjecting Plaintiff to racially charged remarks (e.g., "*This African guy wants an office. Would he have had an office in Africa?*").

- Excluding Plaintiff from departmental meetings.

- Unlawful job transfers:
  - ➢ Reassigning Plaintiff's core responsibilities to a white male colleague, Mr. Klinger.
  - ➢ Reassigning Plaintiff away from her as the executive director to a non-executive white supervisor (Dr. Miller) who was lower in corporate rank.
  - ➢ Isolating Plaintiff by ceasing all communication with him.

- Constructive discharge: Creating intolerable working conditions (e.g., excessive commute demands, denial of reasonable accommodation, denial of time-ff requests, failure to investigate his EEO complaint…) that forced Plaintiff to resign.

- Post-employment retaliation:
  - ➢ Refusing to provide employment verification to prospective employers.
  - ➢ Delaying and sabotaging the EEO investigation.
  - ➢ Pressuring Plaintiff to drop his complaint.

35

230. Plaintiff's EEO complaint and advocacy regarding workplace discrimination and accommodation were matters of public concern because they:

- Addressed systemic issues of racial bias and inequity in Defendant.

- Sought to enforce compliance with anti-discrimination laws and policies.

231. Defendant's retaliatory actions were motivated by Plaintiff's protected speech and were intended to punish him for exercising his rights.

232. Defendant's actions chilled Plaintiff's ability to speak out and deprived him of his constitutional rights.

### Count VIII
### Disparate Impact under Title VII

233. Plaintiff incorporates by reference all preceding allegations as if fully restated herein.

234. Plaintiff, a black U.S. Citizen of African descent, qualifies as a member of a protected class.

235. Plaintiff underwent an interview process, qualified for the role, was hired and performed his duties according to Defendant's business interests. His job performance was excellent.

236. Plaintiff suffered adverse actions as set forth in this complaint due to Defendant's policies and practices, which while facially neutral, disproportionately and adversely affected him based on his race, sex or national origin, resulting in a disparate impact violation under Title VII of the Civil Rights Act of 1964 and other applicable laws.

237. Defendant implemented policies and practices that, though ostensibly applied uniformly, had a discriminatory effect on Plaintiff due to his race and/or national origin.

Key examples include:

- Office Space and Remote Work Policies:

    o Defendant enforced a return-to-office policy requiring Plaintiff to commute 640 miles weekly, despite his role being fully remote-capable and his prior negotiated

agreement for hybrid work. This policy disproportionately burdened Plaintiff, who faced undue hardship (e.g., health risks, exhaustion) compared to other employees colleagues who were not subjected to similar demands.

o The directive to return to the workplace was a breach of contract

o Defendant did not grant reasonable accommodation when that wouldn't have caused under hardship to the employer.

o The forced relocation from an office to a cubicle, while others retained offices, disproportionately impacted Plaintiff's professional standing and ability to perform his duties, particularly given his ergonomic needs and privacy requirements (e.g., for prayer).

- Task Reassignment and Demotion:

  o Defendant systematically transferred Plaintiff's responsibilities (e.g., data management tasks) to a white male analyst, Mr. Klinger, effectively diminishing his role. This practice disproportionately affected Plaintiff as a black employee, as it marginalized his contributions and downplayed expertise.

- Retaliatory Discipline and Exclusion:

  o After filing an EEO complaint, Plaintiff was excluded from meetings, denied time-off requests, and subjected to heightened scrutiny (e.g., threats of performance evaluations). These actions may be constituted a violation of Plaintiff's FMLA rights, more so as Plaintiff visited a doctor to secure recommendation for reasonable accommodation. In addition, these actions fitted a hostile work environment under a continuing violation theory, all due to his protected status.

- Reference and Rehire Practices:

     o   Defendant's refusal to provide employment verification or confirm rehire eligibility to prospective employers disproportionately harmed Plaintiff's career prospects, a pattern consistent with systemic bias against employees of African descent.

238. Defendant's policies (e.g., office assignments, task allocation, disciplinary measures) were not justified by business necessity and disproportionately harmed Plaintiff[2].

239. There were viable alternatives, but the HR and the EEO office hindered all of them.

240. Defendant's policies and practices, though neutral on their face, unlawfully imposed disproportionate burdens on Plaintiff due to his race, sex or national origin, violating federal and state civil rights laws.

## 7. Prayer for Relief

WHEREFORE, for the foregoing reasons and any others that may appear to this Court, Plaintiff prays for judgment as follows on all causes of action including:

a) A Declaration that Defendant violated Maryland law and Plaintiff's constitutional rights for the purpose of unlawful termination;

b) Back pay, front pay, health insurance benefits, and other employee benefits lost as a result of his unlawful termination;

c) Payment of all contributions that would have been made on his behalf to the Baltimore County Pension Fund, from the date of his unlawful termination to the date of his mandatory retirement;

---

[2]Title VII prohibits practices that are not intentionally discriminatory but that have a disparate impact on members of a particular [racial | protected class] group. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) (stating that, under Title VII, the "absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability.") quoted in *Peters v. School Board of the City of Virginia Beach*, No. 01-2413 (CA-01-120-2), (4th Cir. 2003)(alterations added).

d)  Awards of compensatory and punitive damages in amounts to be determined at trial;

e)  An award of pre-judgment and post-judgment interest on all damages awarded;

f)  An award of reasonable attorneys' fees and personal costs; and

g)  All other and further relief, in law or in equity, that this Court may deem appropriate.

### 8.  Demand for Jury Trial

FURTHERMORE, Plaintiff hereby demands a jury trial on the claims set forth herein to the extent authorized by law.

Respectfully Submitted,

/s/_____

Isaac Mulamba
2465 J-17 Centreville Rd
No. 225
Herndon, VA 20171
Tel: 347 241 8618
Email: isaac.mulamba@gmail.com


Orion Legal & Paralegal Services
probono@orionlegalservices.com
(804) 461-3214

### 9.  Certificate of Service

WE HEREBY CERTIFY that on this *25th day of April 2025*, a copy of the complaint was

served to Defendant at the following physical addresses and via email:

Andrew G. Scott
Pessin Katz Law, P.A.,
901 Dulaney Valley Road, Suite 500
Towson, Maryland 21204
AScott@pklaw.com

Respectfully Submitted,

/s/ *Isaac Mulamba*

Isaac Mulamba
2465 J-17 Centreville Rd
No. 225
Herndon, VA 20171
Tel: 347 241 8618
Email: isaac.mulamba@gmail.com

Orion Legal & Paralegal Services
probono@orionlegalservices.com
(804) 461-3214

## COMPLAINT PROCESS – PROTECTED STATUS BASIS

(Authority: SPP Title 5, § 5- 211, et seq.)

For an employee who feels s/he has been a victim of bullying/harassment and/or discrimination ***because*** of the individual's age, ancestry, color, creed, gender identity and expression, genetic information, marital status, mental or physical disability, national origin, race, religious affiliation, belief or opinion, sex, sexual orientation or any other protected status, there are a number of options for pursuing a complaint. Whether a complaint is filed pursuant to Title 5 of the State Personnel and Pensions Article or externally (through the federal Equal Employment Opportunity Commission or the Maryland Commission on Civil Rights) the employee should be aware of the deadlines.

**A complaint filed internally:**

➢ Must be filed in writing;

➢ Must be filed with the head of the principal unit or the EEO Officer;

➢ That alleges a violation of § 5–208 of the State Personnel and Pensions Article must be filed within 1 year after the employee knew or reasonably should have known of the alleged violation (*previously 30 days*).;

➢ That alleges harassment in violation of § 20–606(a)(5) of the State Government Article must be filed within 2 years after the alleged violation that is the basis for the Complaint.

**After the complaint has been received:**

➢ Within 30 days, the EEO Officer shall meet with the complainant and investigate the complaint, and make a recommendation to the head of the principal unit;

➢ The head of the principal unit or designee shall issue a written decision to the complainant, and may grant any appropriate relief;

➢ The decision may be a dismissal of the complaint or a finding that a violation has occurred;

➢ A decision may be appealed to the Office of the Statewide EEO Coordinator in writing and filed within 10 days after receiving a decision.

**§5–211. – Updated** (October 2024)

(a)    An applicant or employee subject to this subtitle may file with the head of the principal unit a written complaint:

    (1)    that alleges a violation of § 5–208 of this subtitle; or

    (2)    that alleges harassment in violation of § 20–606(a)(5) of the State Government Article.

(b)    A complaint under subsection (a)(1) of this section must be filed within 1 year after the complainant (***previously 30 days***) first knew of or reasonably should have known of the alleged violation that is the basis for the complaint.

(c)    A complaint under subsection (a)(2) of this section must be filed within 2 years after the alleged violation that is the basis for the complaint.

# File a Complaint: EEO Complaint Procedure

| Steps in Procedures | Time Line |
|---|---|
| An applicant or employee may **file a written complaint** with the appropriate head of the principal unit within 30 days after the complainant knew, or reasonably should have known, of the alleged violation of the State's Fair Employment Practices Policy (SPP 5-211). | 1 Year (Previously 30 Days) |
| After receiving the complaint, the agency Equal Employment Opportunity Officer shall investigate and recommend a proposed decision to the head of the principal unit. The head of the principal unit shall issue a written decision to the complainant and may grant any appropriate relief. | 30 Days |
| A decision may be appealed to the Office of the Statewide EEO Coordinator in writing and filed within 10 days after receiving a decision. | 10 Days |
| After receiving the appeal, the Statewide Equal Employment Opportunity Coordinator shall review the complaint and the agency decision and conduct any necessary investigation. The Office of the Statewide Equal Employment Opportunity Coordinator shall issue the final decision which may be to grant the relief requested by the complainant or dismiss the complaint. | 30 Days |

**BCPS WORKPLACE POLICY 8420**

INTERNAL BOARD OPERATIONS: Office of Internal Audit

https://go.boarddocs.com/mabe/Defendant/Board.nsf/files/CU3QVU6B32A9/$file/POL8420_071123_Finalized.pdf (available online as of 02/28/2024)

I.    Policy Statement
      The Board of Education of Baltimore County (Board) encourages its employees to support its mission by reporting fraud, waste, abuse, or unlawful acts. The Board prohibits retaliation against any employee who makes a good faith report, or has participated in an investigation or proceeding, of fraud, waste, abuse, or an unlawful act.

II.   Standards
      A. Board employees shall not intimidate or take retaliatory action against any Board employee, or a relative or child of the employee, who makes a report of fraud, waste, abuse, or an unlawful act.

      B. Board employees shall not knowingly or intentionally report unlawful activity or non-compliance that is false or made with malicious intent.

      C. The Department of Human Resources will review complaints of retaliation. Any attempted or actual retaliatory action covered under this policy may subject the violator to disciplinary action, up to and including termination.

III.  Types of Reports Covered by this Policy
      Protected behavior contemplated by this policy includes, but is not limited to:
      A. Disclosing information about conduct that the reporter believes is in violation of law, Board policies, or Superintendent rules;
      B. Providing information or testimony to, or filing a report, that initiates proceedings before a duly constituted investigatory body of the Board;
      C. Disclosing information during an investigation of a good faith report;
      D. Disclosing information during compliance reviews; and E. Filing a legitimate complaint or incident report.

IV.    Prohibited Acts

A. The types of retaliation that are prohibited include, but are not limited to:
1. Intimidation, harassment, and coercion;
2. Adverse actions with respect to the reporter's work assignments;
3. Unlawful discrimination;
4. Termination of employment;
5. Adverse actions against a relative of the reporter who is a Board employee or Baltimore County Public Schools (Defendant) student;
6. Unjustified negative evaluations;
7. Unjustified negative references; and/or
8. Threats of any of the above.

A. Employees who make a good faith report or who participate in an investigation of fraud, waste, abuse, or an unlawful act are subject to the same standards of performance and conduct as other employees. An adverse personnel action against an employee whose conduct or performance warrants such action for reasons unrelated to a report of retaliation will not be deemed a violation of this policy.

VI. Reporting
An employee who has filed a report and/or has participated in an investigation concerning fraud, waste, abuse, or an unlawful act, and who believes that they are the subject of retaliation, may submit a written or oral complaint to the Office of Equal Employment Opportunity.

VII. Violations
Employees who violate this policy shall be subject to disciplinary action, up to and including termination.

VIII. Implementation:
The Board shall implement this policy.

## MPIA Regulations

*Annotated Code of Maryland Article, §§ 4-101 to 4-601*

The response to a MPIA request will be within a reasonable period, but not more than 30 days after receipt of the request. In the event the time to produce the record is estimated to be more than 10 working days, the requester will be contacted in writing or by electronic mail with the amount of time anticipated to produce the public record. If there's a need for additional time, the requester will be contacted to discuss an extension of time. If the request cannot be fulfilled otherwise, the requester will be contacted within 10 calendar days of receipt of the request.